IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs Sept. 22, 2009

## MICHELLE TIPTON v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court of Sevier County**
**No. 11896-11    Richard R. Vance, Judge**

———————————————

**No.  E2009-00236-CCA-R3-PC - Filed Janaury 6, 2010**

———————————————

A Sevier County jury convicted the Petitioner, Michelle Tipton, of felony murder, robbery, and second-degree murder, and the trial court imposed a life sentence.  On direct appeal, this Court reversed the second-degree murder conviction, merged the robbery conviction with the felony murder conviction, and affirmed the life sentence.  The Petitioner filed a petition for post-conviction relief claiming she received the ineffective assistance of counsel.  The post-conviction court denied relief after a hearing, and the Petitioner now appeals.  After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Michael T. Cabage, Knoxville, Tennessee, for the Petitioner, Michelle Tipton.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Rachel West Harmon, Assistant Attorney General; James B. Dunn, District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Facts**

**A.  Background**

On direct appeal, this Court set forth the following summary of the facts underlying this appeal:

> At approximately 5:00 a.m. on October 4, 2000, David Reynolds, Jr. called

to check on Pamela Hale who was employed as a clerk at Family Inns East in Pigeon Forge but was unable to get a response. Reynolds, who held a supervisory position with a local hotel chain, which included Family Inns East, had previously spoken with Hale three times on the night of October 3 regarding an auditing problem. Because Hale had been sick the previous evening, Reynolds asked an employee of another hotel to check on Hale. Arriving at Family Inns East, the employee informed Reynolds that a Pigeon Forge police officer was at the motel. Reynolds arrived at the scene around 6:00 a.m. and found Hale lying behind her desk in a pool of blood.

Wayne Knight, an evidence technician with the Pigeon Forge Police Department, arrived at Family Inns East in the early morning hours of October 4, 2000, and found the motel's office in a state of disarray. Coins were lying on the floor, cash drawers and computer monitors were turned over on the check-out counter, and a phone had been knocked off a desk to the right of the check-in counter. The victim was lying face down on the floor behind the desk. In the course of his investigation, Knight determined that some of the cash drawers were missing. Later that afternoon, the missing drawers were discovered on the banks of the Little Pigeon River.

Elizabeth Reid, a forensic scientist with the Tennessee Bureau of Investigation's crime lab, testified that she examined the cash drawers and dusted them for fingerprints. Finding latent prints on the drawers, she compared them with the fingerprints of Brandon Tipton and identified a match. She also received the Appellant's fingerprint card but did not identify her prints on the drawers. Detective Tim Trentham with the Pigeon Forge Police Department testified that on July 13, 2001, Brandon Tipton was interviewed as result of his fingerprints on the cash boxes. Later that day, Brandon Tipton gave a statement to the police implicating himself and the Appellant in the homicide and robbery

> [Footnote 1] On the date of the murder, the Appellant and Brandon Tipton were single and shared a residence in Pigeon Forge. The two were married on October 5, 2000, the day following the murder.

The same day [the Petitioner] gave a statement to Special Agent A.R. McCall with the Tennessee Bureau of Investigation and Jake Stinnett of the Pigeon Forge Police Department that she was not with Brandon Tipton on the night of October 3, 2000; however, she confirmed that she did return to their residence around 7:00 a.m. the next morning. Later that evening Barbara Ward, CID Lieutenant with the Pigeon Forge Police, received a phone call from the Appellant stating that she had lied in her earlier statement and that she was in fact at the residence on the night of October 3, 2000.

On July 14, 2001, the Appellant appeared at the Pigeon Forge Police

Department to inquire about her husband's status. Detective Trentham advised the Appellant of her Miranda rights, which she signed, and he handed the Appellant her husband's statement. Trentham testified that the Appellant "read the first page of the confession, flipped to the second page and began reading it and at some point, I don't know how far she read into the second page, she laid it down and said, that's true, that's what happened." Trentham then interviewed the Appellant and prepared a written statement which she read, made changes to, and signed. The Appellant's statement reads:

> After midnight me and Brandon went to Gatlinburg. Brandon was going to burglarize TCYB [sic] on Airport Road. When we got there a police officer was parked nearby and we couldn't do it. Later that night we drove to Pigeon Forge. We saw the lights on in Family Inns East and the clerk inside. I parked near the office and Brandon and I went in and ask [sic] about a room. We got a key from the lady desk clerk and looked at a room. We returned to the office. Brandon walked to the brochure rack to the left of the desk where the clerk was standing. Without warning, Brandon hit the desk clerk in the head with bolt cutters. The clerk grabbed her head and Brandon hit her a couple more times. Brandon grabbed the cash drawers and we ran to my car. We left the motel and drove to our apartment at 522 1/2 Oldham Street. We took the cash boxes inside and Brandon got them open. There was approximately $500-$600 inside. We loaded the cash boxes back in the car and drove south through Pigeon Forge and onto the Spur. We turned at the first bridge and down north toward Pigeon Forge. I stopped at the first pull off just before Pigeon Forge. Brandon threw the cash boxes in the river. We then drove to Iron Mountain Road and Brandon threw the bolt cutters into the woods.

Based on this information, Trentham located the bolt cutters. He later spoke with the Appellant at the Sevier County Jail where the Appellant drew a diagram of Family Inns East. She also asked whether her fingerprints were obtained from the crime scene and stated that she was careful not to leave any fingerprints at the office pulling her sweater over her hands. She also stated that when pulling out of the parking lot of Family Inns East she had accidently hit Brandon's leg.

Nichole Frierson Nutting testified that while incarcerated at the Sevier County Jail on misdemeanor convictions, she came in contact with the Appellant. The Appellant told Nutting that she and her husband had planned to rob Family Inns East; however, the victim had recognized them as employees of the Log Cabin Pancake House. The Appellant told her that she and Brandon used bolt cutters to kill the victim and that they took cash boxes from the motel, discarded them on the Spur between Pigeon Forge and Gatlinburg, and used part of the money to get married the

next day. The State introduced a marriage certificate showing the Appellant and Brandon Tipton were married on October 5, 2000. Yvonne King, manager of the dining room of the Log Cabin Pancake House in Pigeon Forge, testified that the Appellant worked at the restaurant as a waitress from March until May of 2000 and that Brandon Tipton was employed as a busboy until May of 2000.

At trial, the Appellant testified that on the day of the crime, Brandon Tipton gave her Klonopin pills which made her memory "blotchy." After midnight, she and Brandon Tipton drove to Gatlinburg to burglarize TCBY. The Appellant had previously worked at the store and knew that it had a cash box and a small padlock on the door. Their plans were thwarted when they discovered a police officer at the end of the street near TCBY, so they headed back home. En route, Brandon told the Appellant to pull into Microtel in Pigeon Forge. The couple walked in, asked the price of a room, and walked out. She testified that on the way to Sevierville, Brandon told her to stop at Family Inns East, which was located less than a mile from the couple's home. Brandon asked the clerk if he could see a room, and the clerk handed him a key. They inspected a room and returned to the office where the Appellant suddenly saw Brandon swinging bolt cutters at the victim's head. The Appellant testified that at this point she ran out the front door to her car. As she began to back out, Brandon opened the passenger door and she hit him with the car. When they arrived at the apartment, the Appellant ran upstairs, and Brandon sat in the livingroom opening the cash boxes. He then directed the Appellant to drive back into Pigeon Forge where he threw the cash boxes out the window.

Dr. Cleland Blake, who was the Assistant State Chief Medical Examiner in October of 2000, performed an autopsy on the victim. He stated that the victim had one blunt traumatic injury to the high center of her forehead. Additionally, he testified that the victim had around fourteen blunt trauma injuries to the top of her head which tore the scalp at several points and crushed the skull bone into the brain. Dr. Blake opined that the cause of death resulted from "damage" and "hemorrhage into the brain."

A presentment was returned by a Sevier County grand jury charging the Appellant with first degree premeditated murder and first degree felony murder. The Appellant's trial commenced on July 29, 2003, with the jury returning a guilty verdict for second degree murder and first degree felony murder on July 31. The jury fixed the Appellant's sentence at life imprisonment, and the trial court merged the Appellant's conviction for second degree murder into her conviction for first degree felony murder.

*State v. Michelle Tipton*, No. E2004-01278-CCA-R3-CD, 2005 WL 2008178, *1-3 (Tenn. Crim. App., at Knoxville, Mar. 22, 2005), *perm. app. denied* (Tenn. Jan. 30, 2006). On direct appeal, this Court reversed the Petitioner's second degree murder conviction, merged her robbery conviction

with her conviction for felony murder and affirmed her life sentence. *Id*.

## B. Post-Conviction Hearing

The Petitioner filed a timely petition for post-conviction relief, counsel was appointed for the Petitioner, and the Petitioner amended her petition to claim that she received the ineffective assistance of counsel. The post-conviction court held a hearing wherein the Petitioner and her trial counsel ("Counsel") testified. The Petitioner testified Counsel made damaging statements in opening and closing arguments and failed to object to improper testimony.[1]

The Petitioner testified that she did not believe Counsel defended her adequately, especially because Counsel stated in front of the jury that she was "guilty." She also testified she had never met Nicole Frierson, the woman whom the State presented as the jail mate to whom the Petitioner disclosed her involvement in the killing. The Petitioner insisted that Frierson could only have known about her trial through the publicity her trial generated.

On cross-examination, the Petitioner acknowledged that Counsel objected to Frierson's testimony, but the trial court overruled Counsel's objection. She also acknowledged that she sent numerous letters to her husband, even after he had been convicted of the murder in this case. She acknowledged that she drove her husband to and from the killing. She acknowledged that she "never expected the jury to just turn [her] loose" and that she hoped the jury would find her guilty of a lesser-included offense of first degree murder. She also acknowledged that Counsel repeatedly told the jury that she was not guilty of first degree, premeditated murder, though she disagreed that his strategy of arguing that she was guilty of a lesser-included offense was "the best strategy." The Petitioner concluded her testimony by insisting that Counsel failed to zealously defend her.

Counsel acknowledged that during the opening arguments of the Petitioner's trial he said the Petitioner knew her co-defendant worked at the hotel where the murder occurred and that he "might be checking it out." He also acknowledged saying she was "guilty" of being present when he carried out the murder. Counsel explained that, while he referred to the Petitioner's general awareness of her co-defendant's criminal propensity, he also impressed upon the jury the Petitioner's ignorance of her co-defendant's plan to kill the victim, explaining his strategy as follows:

> [The Petitioner] had been with [the co-defendant] continuously. They got married the [day after the murder], so it was kind [of] a theme of mine that she was guilty [of] being with him, but I repeatedly say she is not guilty of murder. Any type of accessory after the fact, anything like that would have been a victory. I just didn't want her to get the felony murder charge. I thought we could beat the first degree murder charge because I didn't see any premeditation, but the felony murder charge

---

[1]We have omitted from these facts the testimony presented pertaining to allegations not pursued by the Petitioner on appeal. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

scared me and I was just trying to mitigate it, her appearance there and some of the things she had done.  That was my trial strategy.

. . . .

. . . . I think she was stunned that it happened.  She didn't know it was going to happen.  I think you can sense something might happen, but if you are not sure, you are not held to that standard.

Counsel recalled that during closing arguments he told the jury the Petitioner drove her co-defendant to Gatlinburg in order for him to rob a store but she did not know he would hurt anyone.  He explained that, in making this statement, he was not implying that she had knowledge of her co-defendant's intent to commit the robbery in this case, which occurred in Pigeon Forge.  He was arguing instead that, because her co-defendant never carried out the Gatlinburg robbery, and the pair returned to Pigeon Forge, the Petitioner no longer had any reason to know that her co-defendant would rob the Gatlinburg hotel.  Counsel then argued that, ignorant of her co-defendant's intent to rob the hotel, the Petitioner could not have committed felony murder or first degree murder.

Counsel also acknowledged that during closing arguments he said, "She is guilty and she is responsible" and, "She told you she needs to be punished."  Counsel explained he followed these comments by insisting that the Petitioner was not guilty of murder but only of being an accessory after the fact or of facilitating the murder.  He explained that, although the Petitioner's statement that she was "guilty" and deserved to be "punished" was admitted, her fingerprints were not on anything in the hotel.  Given the lack of evidence linking her to the murder scene, he planned to argue that she was not present during the crime and, at most, helped him flee the state after the murder.

Although Counsel acknowledged saying that the Petitioner knew her co-defendant "was up to no good," he recalled that he then said, "but she didn't have specific intent and she can't be punished for these crimes.  She is not guilty.  She didn't want a burglary or a robbery to happen and she didn't help with that robbery.  She didn't carry the boxes out.  She didn't break into the boxes, [her co-defendant] did.  She didn't hit anyone."

Counsel acknowledged that one of the State's witnesses, Detective Trentham, testified that a change in the Petitioner's facial expression during the interview she gave to police indicated to Trentham that the Petitioner "knew she had been caught."  The detective testified, "Her whole expression changed.  Her whole face, you know, her expression was on her face.  The way she acted, you could tell she knew she had been caught and it was over at that point.  That is the way I felt."  Counsel testified that he objected twice, both times without success, to this testimony before the Petitioner's trial.  He said that he simply forgot to object at trial when the testimony was introduced, but that he should have objected when it was introduced.  He recalled, however, that the detective followed his recollection of the Petitioner's facial expression with an account of the confession the Petitioner then immediately made.  Counsel explained that he tried to minimize the damage of the

6

confession by explaining that the Petitioner, in her "confession," did not accurately report her involvement but rather copied the account her co-defendant had given in his confession. He explained that the Petitioner did this in order to deflect blame and punishment from her co-defendant, to whom she was married.

Regarding the testimony to which the Petitioner objects, Counsel recalled that two witnesses, a fellow jail inmate and a detective, testified about the Petitioner's lack of remorse. He recalled that Nicole Frierson, a jail mate of the Petitioner during the time of her trial, testified that the Petitioner never displayed any "sadness" in the jail cell on the evenings following her trial. She recounted that the only time the Petitioner displayed emotion was when the Petitioner cried the evening following the trial session in which she learned the State was seeking the death penalty against her. Counsel recalled he filed a written objection to Frierson's testimony before trial based on his belief that Frierson would receive a reduced sentence for her testimony, but the motion was denied. He conceded that he did not object to her testimony about the Petitioner displaying no remorse, and he acknowledged that the testimony may have influenced the jury's perception of the Petitioner's guilt.

Counsel agreed that Detective Trentham also testified about the Petitioner's lack of remorse, and he agreed that this testimony might have influenced the jury.

On cross-examination, Counsel testified that he had worked as a criminal defense attorney in Tennessee for approximately twenty years, the last ten of which he had worked as a public defender in Sevier County, defending several murder cases. He recalled that the charges against the Petitioner were commenced when she came into the police station with her husband, the co-defendant, after police summoned him to question him about his involvement in the victim's death. The Petitioner initially denied knowing anything about the killing, but, after her husband made a full confession, she confirmed that his confession was accurate, and she acknowledged driving him to and from the scene of the robbery and killing. He also recalled that the Petitioner's jail mate also testified that the Petitioner disclosed to her that she and her husband had killed the victim after robbing the hotel because her husband realized the victim recognized him. Counsel confirmed that the Petitioner married her co-defendant the day after the killing and agreed that this also cast doubt on her assertion that she did not know or approve of her co-defendant's intention to kill the victim. Counsel agreed that the Petitioner's affirmation of her co-defendant's account of the killing as well as her jail mate's testimony made the State's case for felony murder against the Petitioner very strong and his task as a defense lawyer "very difficult."

Recalling again the detective's testimony about the Petitioner's "changed" facial expression, Counsel testified that although he initially believed the testimony was inadmissible, he now believed the testimony may have been admissible.

Recalling again the detective and Frierson's testimony about the Petitioner's lack of remorse, Counsel agreed that the Petitioner's lack of remorse damaged the credibility of her account of the killing in which she insisted that she did not know a homicide would occur.

At the conclusion of the hearing, the post-conviction court found that Counsel was not ineffective in opening and closing arguments and that his failure to obtain the exclusion of Detective Trentham and Frierson's testimony did not constitute ineffective assistance of counsel. Accordingly, the post-conviction court denied relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends Counsel failed to provide effective assistance, arguing that Counsel: (1) made improper statements during opening and closing arguments; (2) failed to object to a detective's testimony about the Defendant's facial expression; and (3) failed to object to testimony about the Petitioner's lack of remorse. The State responds first that, because Counsel's statements during opening and closing argument were the result of a strategic decision to limit the Defendant's criminal liability, Counsel was not ineffective in opening and closing arguments. Second, the State responds that Counsel did object, though unsuccessfully, to the investigator's statements, and that, in any case, the statements' admission did not prejudice the Petitioner given the weight of the evidence of her guilt. The State argues that Counsel's failure to object to testimony about the Petitioner's lack of remorse likewise did not prejudice the Petitioner given the weight of the evidence of the Petitioner's guilt.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the

8

defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n. 38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the case under submission, the post-conviction court concluded at the end of the post-

conviction hearing that Counsel was not deficient in any regard. The court reasoned:

> [Counsel] was an able counsel. He has represented defendants in criminal cases for over 20 years, ten of which were as a primary assistant public defender here in this county. He has extensive experience in murder trials. He is well-experienced counsel.
>
> The Court has considered the [P]etitioner, the testimony of [Counsel], the testimony of [the Petitioner], the statements and arguments of counsel, the transcripts of the testimony and arguments upon which the points have been raised and determined in light of the cases that determine the competency of counsel beginning with *Baxter v. Rose* and the whole succession of cases afterwards, but it boils down to whether or not [Counsel], by his conduct was ineffective in representing [the Petitioner].
>
> . . . .
>
> The proof in this case was powerful, overwhelmingly showed [the Petitioner's] guilt of a crime for which she was convicted by statements she gave, by the statement of Brandon Tipton that she adopted as hers, . . . by her testimony, by her conduct as testified to by a jail inmate, by the recovery of bolt cutters which she made available to the officers. Because of the overwhelming evidence [of] her conduct throughout the time before the homicide and afterwards, her conduct was inextricably bound with the co-defendant, Brandon Tipton, whom she married the day after the murder, continued while they were both in custody with letters written back and forth.
>
> . . . . [Counsel] took the only approach he could take in trying to get the jury to find [the Petitioner] only guilty of some lesser offense than the felony murder. You can't take the lines referred to–the words referred to out of context to the entire argument and thrust of [Counsel's] arguments that he made. You have to look at the entire argument and it shows clearly that he took the evidence and the facts that were handed to him and made the very best out of them that any attorney could.
>
> Oftentimes it is a matter–it is a subjective analysis of whether or not his strategy was effective or not. And, again, you can't measure whether it was effective as a matter of law as to whether or not the jury agreed with him. In looking back over the trial and the evidence, it was really the only strategy he had. He could not argue and deny she wasn't there. He could not argue and deny that she was involved with [the co-defendant] on this night. They had made other, I won't say attempts, but considered robbing or stealing from other places even before they came to this one, so the Court must find that [Counsel's] strategy and arguments were consistent with the evidence he had to deal with and made the best arguments possible in view

10

of the facts and circumstances of this case, and, therefore, was in the best light of a counsel's duty.

It was further argued that he failed to object to certain testimony regarding [the Petitioner's] facial expressions and the officers' own conclusions about, "She knew she was caught," or words to that effect. While an objection could have been made and sustained and the jury instructed to disregard, the Court finds that in view of the overwhelming, overpowering evidence, that the effect of that comment, if any, on the jury's determination of guilt or innocence would have been minuscule. The same is true for the comments by the jail inmate of Ms. Frierson . . ., who testified concerning her observations of [the Petitioner]. Again, if objectionable, its impact was minimal in view of the overwhelming nature of the other evidence in the case.

. . . .

So, considering all of these matters, the Court must find that [the Petitioner] has failed to carry the burden of proof. The Court finds by compelling evidence that [Counsel's] conduct, his counsel in representing her in this most serious case was not only effective but to the highest standards of the legal profession that he represented her ably and that he presented the best defense he could possibly present given the facts and circumstances he had to work with. So let the petition be denied.

### A. Statements Made During Opening and Closing Arguments

The Petitioner argues first that Counsel was ineffective for telling the jury during opening and closing arguments that the Petitioner was "guilty." The post-conviction court in this case found that Counsel's words were part of his effort to obtain a conviction for any lesser included offense of first degree premeditated murder, for which the Petitioner could receive the death penalty. Indeed, the State introduced a great deal of evidence against the Petitioner; the Petitioner's own confession, the evidentiary corroboration of her confession, her jail mate's recollection of the Petitioner's disclosures about the killing, and the relationship the Petitioner maintained with her co-defendant after the killing. This evidence strongly supported the Petitioner's presence during the killing and cast doubt upon her ignorance of her co-defendant's intention to kill the victim. Also, testifying that she did not expect the jury "to just turn [her] loose," the Petitioner herself conceded that she did not expect to be acquitted of all charges but rather hoped to be convicted of something less than first degree premeditated murder. Also, the trial transcript, as referenced during the post-conviction hearing, indicates Counsel made reasonable efforts to minimize the Petitioner's involvement in the killing, asserting that the Petitioner's greatest error was associating herself with her co-defendant. We agree with the post-conviction court that Counsel's statements in opening and closing arguments were part of a reasonable strategy Counsel employed to limit the Petitioner's criminal liability. *See House*, 44 S.W.3d at 515. As such, the Petitioner is not entitled to relief on this issue.

11

## B. Failure to Object to Investigator Trentham's Testimony

The Petitioner next objects to Counsel's failure to object to Investigator Trentham's testimony about the facial expressions the Petitioner made while she gave statements to police. Counsel testified that he unsuccessfully objected to the detective's testimony about the Petitioner's facial expression at a preliminary hearing. At trial, Detective Trentham testified that, when the Petitioner learned her co-defendant confessed to killing the victim, the Petitioner's facial expression changed such that he could tell she "knew she had been caught." After recalling this, the detective described the confession the Petitioner gave immediately after her facial expression changed. Counsel failed to object at trial when the detective gave this testimony. Given the strength of the evidence against the Petitioner, including the detective's recollection of the Petitioner's confession, we conclude that the Petitioner has failed to demonstrate prejudice from the testimony about her facial expression. *See Strickland*, 466 U.S. at 694. The Petitioner is not entitled to relief on this issue.

## C. Failure to Object to Testimony about the Petitioner's Remorse

The Petitioner's final objection pertains to Counsel's failure to object to testimony about the Petitioner's lack of remorse. Indeed, the Petitioner's jail mate, Nicole Frierson, testified that only when the Petitioner learned the State might seek the death penalty did the Petitioner display emotion on the evenings separating the days of her trial. Whether or not the trial court properly admitted Frierson's testimony, Counsel's failure to successfully object to its admission is not a basis for relief for the Petitioner. As we have concluded with respect to each of the Petitioner's preceding objections, the weight of the evidence against the Petitioner minimized the effect of Frierson's testimony. Therefore, the Petitioner fails to demonstrate prejudice from Counsel's failure to gain suppression of the excluded testimony. *See Strickland*, 466 U.S. at 694. She is not entitled to relief on this issue.

## III. Conclusion

After a thorough review of the facts and relevant authorities, we conclude the Petitioner received the effective assistance of counsel. Accordingly, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE